ARDMORE CONSTRUCTION COMPANY, a Partnership Composed of Walter F. Sheehan & John B. Gutmann,

v.

The UNITED STATES.

No. 49045.

United States Court of Claims.
Jan. 31, 1956.

Newell Blair, Washington, D. C., and Malcolm I. Frank, St. Louis, Mo., for plaintiff. Chisman Hanes and Blair & Blair, Washington, D. C., were on the briefs.

John F. Wolf, Washington, D. C., with whom was Warren E. Burger, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

MADDEN, Judge.

The plaintiff sues for damages for several alleged breaches of contract by the Government. The contract in question called for the construction by the plaintiff of a large number of "hutments" or barracks, 10 lavatory buildings and a large messhall at the Air Forces Replacement Center Project at Jefferson Barracks, Missouri, which is near St. Louis.

The plaintiff's project was one of several construction projects carried on at Jefferson Barracks by different contractors. The plaintiff's contract was dated November 30, 1942; it required that work be commenced within three days after the receipt of notice to proceed; the notice to proceed was also given on November 30. The contract required a considerable part of the work to be completed by January 15, 1943, and the rest of it by February 1. It was a unit price contract, and the estimated total contract price was $264,117.95.

It is apparent that the plaintiff undertook to do an extensive building job in a few weeks in midwinter. In connection with several of its claims the plaintiff complains that it was not given extensions of time because of snow and some days of near zero weather. One wonders what kind of weather the plaintiff anticipated when it made the contract.

From the Government's standpoint, the completion of the work on time was urgent. Troops by the thousands were coming into Jefferson Barracks and were being housed temporarily in tents. All the Government officers who supervised the construction were insistent, and it would seem, rightly insistent, that the work be finished on time, if it was possible to do so. The contract did not contain a provision for liquidated damages for late completion.

The Government was to furnish the lumber for the project or make allocations to the plaintiff from sources under Government control. At the beginning of the work, the Government had seventeen carloads of lumber available and shortly supplied six more carloads. This was half of what would be required for the entire job. For the rest of the lumber it took a lot of planning by the Government expediter to keep lumber available, for it was scarce and in great demand. It came in by truckloads from wherever it could be obtained. But it came in, and the plaintiff's work was not seriously delayed by shortages of lumber. Some 2 x 4's had to be made by ripping 2 x 8's, but the plaintiff was paid extra for the cost of doing that.

The plaintiff complains of the quality of the lumber in the original 17 carloads furnished by the Government. The dimension or framing lumber seems to have been all right. But a large proportion of the boards were gum wood, which is harder to use in construction than most kinds of wood. We have concluded that the plaintiff's labor costs in using the inferior lumber were $10 more per thousand board feet, and that the plaintiff was damaged thereby in the amount of $2,868.75.

The plaintiff says it was damaged by a shortage of nails, which were to be furnished by the Government. Nails were scarce, and the supply sometimes ran low, but the work was not seriously impeded by the scarcity of nails.

Floor panels which had been dismantled at Scott Field, Illinois, were to be used in the 5-man hutments which the plaintiff was to erect. The Government was to deliver the panels to the site of the hutments. The plaintiff hauled eight of these panels and was paid $5 each for doing that. It claims that it hauled 246 more such panels, but the evidence does not show that it hauled more than the eight for which it was paid.

The plaintiff claims that it was damaged by not being able to pour parts of the concrete slab which was to be the floor of the large messhall. It says that if it could have done so, it would have had a dry, level platform on which to build the trusses, or frames, for the sides of the messhall, and would not have had to build them on the muddy ground. It says that the reason it could not pour sections of the concrete slab was because the ditches dug for the placing of the sewer under the messhall could not be filled and the concrete slab placed over them, until the sewer lines had been pressure tested. It says that the Government would not allow the sewer lines to be tested in sections, as it might have done, and hence no part of the ditches could be filled in, and no part of the concrete slab could be poured, until all the sewer lines under the messhall were constructed and tested.

The Government says that the plaintiff's plumbing subcontractor refused to test the sewer in sections. A Government witness before the Board of Contract Appeals testified that if the sewer had been tested in sections before the "runout" lines were placed, there would have been no way to test the runout lines when they were placed. There is no explanation in the record as to why this was not a good reason for refusing to permit the testing of the lines in sections, if it was not a good reason. There is also no explanation as to why the plaintiff's subcontractor did not finish the sewer lines under the messhall so that they could be tested as a whole, if the delay in testing was causing damage to the plaintiff. The evidence on this claim is conflicting and incomplete, and does not persuade us that the Government was at fault.

Mr. Eugene B. Sydnor was the plaintiff's superintendent on the contract work. Mr. Walter F. Sheehan was one of the partners of the plaintiff company, and spent much of his time at the job. By January 18, 1943, the messhall was closed in and the concrete floor was completely poured. On January 19, the temperature was five degrees below zero at 8 a. m. During the morning, Mr. Sheehan told Mr. Sydnor to discontinue operations on the entire project while the weather was so cold. There was work for many men in the messhall, which was heated, apparently by salamanders, and lighted. The Government's representative seems to have ordered that the indoor work continue, for some men continued to work.

On January 20, the Government's representative requested Mr. Sheehan to give up his pass to enter the job site, and Mr. Sheehan did so. The Government representative's report to his superior said that Mr. Sheehan's given reason for wanting to close down even the indoor work was that if any men at all worked, the plaintiff could not claim credit for days lost. Mr. Sheehan's pass was restored in about a week. The plaintiff claims that its work suffered greatly in efficiency during Mr. Sheehan's absence. There is no satisfactory proof as to how much, if any, loss of efficiency occurred. We therefore find it unnecessary to consider the question of whether the lifting of the pass was justified.

The plaintiff complains that it was not granted extensions of time on account of adverse weather conditions. It was required to work extra shifts and overtime to bring the work up to date, and if its time had been extended it would not have had to incur this extra expense. As we have already said in this opinion, a contractor who undertakes a rush job in midwinter must expect that he will lose some time on account of the weather, and must expect to have to make up that time somehow. The orders of the Gov-

**279**

ernment representative to work overtime and extra shifts seem to us to have been well within his authority under the contract. The zero weather and snow did not prevent the soldiers from coming in to Jefferson Barracks nor make it unnecessary to construct facilities to house and feed them.

The plaintiff's losses resulted, we think, almost entirely from the fact that it, apparently inadvertently, bid too low for the work. Its only meritorious claim is for $2,868.75, the extra cost of using the inferior lumber, and the $10 which was tendered with the final payment voucher and refused by the plaintiff. The plaintiff may have a judgment for $2,878.75.

It is so ordered.

JONES, Chief Judge, and LARAMORE, WHITAKER and LITTLETON, Judges, concur.